Patricia Ann **JACKSON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 45102.

Court of Criminal Appeals of Texas.

July 12, 1972.

865

Percy Foreman, Houston (on appeal only), Dick DeGuerin, Houston (on appeal only), for appellant.

Robert O. Smith, Dist. Atty., and Michael J. McCormick, Asst. Dist. Atty., Aus-tin, and Jim D. Vollers, State's Atty., Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

This is an appeal from a conviction of murder. The jury assessed the punishment at twelve years.

The sufficiency of the evidence is challenged.

Harvey L. Merida and Edward Lee Warren were the key witnesses for the State. Merida testified that on May 2, 1970, he went to bed at Warren's house around midnight after Warren had left. Sometime between 5:00 and 6:00 a.m., Irving Wayne "Bird" Fowler, the deceased, the appellant and another woman arrived. Merida got up and had a few drinks with them before the second woman left. Because the appellant was "sarcastic" with the deceased, Merida went back to bed leaving the two alone.

Merida also testified that the next thing he recalled was the appellant shaking him and saying, "Wake up; I just shot Bird." Merida went into the other room and found Fowler slumped on the sofa with a gun in his hand. The appellant was crying, and Merida removed the gun from Fowler's hand and put it somewhere in his bed.

Merida placed Fowler in the front seat of his car and appellant got in the back. While Merida drove Fowler to the hospital, the appellant "was crying and she was talking about losing her kids for what had happened." Merida testified that appellant also said, "I am sorry," and, "I loved him, but he kept shooting me over the edge." Merida explained this latter phrase as slang for hurting someone and that it also meant or showed jealousy.

After taking Fowler to the hospital Merida took the appellant with him to get

Warren. While returning with the appellant and Warren to the hospital Merida testified that Warren asked the appellant, "Why did you shoot Bird?" The appellant replied, "He kept shooting me over the edge." Fowler died in the hospital from what the testifying pathologist stated was bleeding as a result of a gunshot wound.

Around 4:30 p.m. on May 3, Merida called Sergeant Kelton at the Austin Police Department and told him he was bringing him something. Merida then got the pistol and shells and took them to the officer.

On cross-examination Merida testified that the appellant had always maintained the shooting was an accident.

Edward Lee Warren, whose nickname was "Lee Baby," testified that on May 3, 1970, Merida came to get him at a friend's house around 9:00 a.m. and told him the appellant had shot "Bird." On the way to the hospital the appellant said she shot him "because he kept shooting her over the edge." Warren also testified that she said something about losing her little girl. He did not recall her saying anything about an accident until after the date of the shooting when the appellant called him and said it was an accident. On cross-examination Warren stated that the appellant might have told him it was an accident on the way to the hospital. Warren also testified that appellant carried a gun with her. Prior to May 3, she had pulled the gun and pointed it at him and possibly at Fowler. He had heard appellant and Fowler when they were having arguments.

In her third ground of error, appellant contends the trial court erred in excluding evidence of the bias and prejudice of Warren. The trial court refused to allow appellant to cross-examine Warren regarding his activity in distributing certain handbills and about animus, bias or interest. A copy of a hand printed handbill which had been reproduced was introduced before the court for the appellant's bill of exception. It reads as follows:

The "BLACK" Trial

JUSTICE
IN AUSTIN

Pat Ann Jackson (Accused Murderess of ERVIN WAYNE FOWLER) "BIRD".

COME AND SEE JUSTICE IN YOUR VERY OWN CITY.
"MONDAY"

May 24—9:30
"COUNTY COURTHOUSE"

On cross-examination of Warren the following occurred:

"Q. Since the shooting, is it not true that you have been attempting to gain or get witnesses in this case so as to convict Mrs. Jackson?

"A. No.

"Q. It is not. Have you been passing out—"

Objection was made and the jury retired. Then the following took place:

"Q. Mr. Warren, isn't it true that you have been passing out in East Austin handbills concerning this trial?

"A. Yes, I passed out a few.

"Q. And you have been attempting, have you not, to have people come up here and hear the case—have you not?

"A. Right.

"Q. Alleging, in effect, that this case will not be tried in accordance with justice?

"A. I don't think so.

"Q. You don't think so?

"A. No.

"Q. Why?

"A. Because I don't believe there is any justice in Austin."

The appellant's attorney offered the handbill into evidence. An objection by the State was sustained. The jury was returned and appellant's counsel asked Warren if he had been "going out attempting to obtain witnesses against Mrs. Jackson, attempting to find them and attempting to get people to testify against her." Again Warren denied having done this. He was asked: "Have you been going out and talking about this case to various people, attempting to have them come up here into the courtroom?" and he answered, "Yes."

On redirect examination Warren testified as follows:

"Q. All right. Mr. Warren, Mr. Maloney (counsel for the defense) has intimated you wanted to get the Defendant convicted; is that correct?

"A. Yes.

"Q. Would you come up here and testify and lie to this jury in order to get her convicted?

"A. No, I wouldn't.

"Q. Are you here to tell the truth and nothing but the truth?

"A. I will definitely do that."

On recross-examination Warren was asked: "You have been going all over town, have you not, telling people that you wanted to see Mrs. Jackson convicted, and you would do anything in your power to see that it was done?" He answered, "No."

Later, for the purpose of the bill of exception, Mrs. Carrie Denman testified that she had seen Warren passing out the handbill.

In Ogburn v. State, 101 Tex.Cr.R. 180, 274 S.W. 638, Judge Berry wrote for the Court:

"It is well settled that motive or animus that actuates a witness at the time of his testimony is never regarded as immaterial or collateral matter, and the adverse party has the right to prove any motive or declaration of a witness which will tend to show his bias, interest or prejudice, or any other mental condition of the witness which in any manner tends to affect his credibility."

The Court stated the same rule in Curry v. State, 72 Tex.Cr.R. 463, 162 S.W. 851, 857, and wrote:

"Great latitude is allowed in asking questions on cross-examination. A witness may be asked any question, the answer to which may have a tendency to affect his credibility. And if he denies anything that would show a motive for, or animus to, testify against a party, it may be shown by other witnesses and by independent facts."

■ Wide latitude is allowed in cross-examination when its purpose is to bring out facts which will give to the jury the attitude, motive and interest which may be affecting the testimony of a witness. Blake v. State, Tex.Cr.App., 365 S.W.2d 795. See 1 Branch's Ann.P.C.2d, Section 185, pages 192–195, and the many cases there cited.

■ In the present case Warren admitted while testifying a desire to see the appellant convicted. He further admitted talking to various people about the case and attempting to get them to come to the courtroom. The State contends that since the witness made it clear that he was interested in seeing the appellant convicted, the appellant could not ask for more. This Court has held, however, that when a witness admits bias and prejudice proof of particular acts tending to show this bias and prejudice is admissible to show its extent. Smith v. State, 106 Tex.Cr.R. 202, 291 S.W. 544.[1] See also Powitzky v. State, 134 Tex.Cr.R. 613, 117 S.W.2d 72.

---

1. Clark v. State, 67 Tex.Cr.R. 38, 148 S.W. 801, is sometimes cited to the contrary. In Clark, however, the trial court's denial of continued cross-exami-

The handbill in question does not on its face necessarily indicate any prejudice toward the appellant. The bias and prejudice from the handbill and Warren's testimony outside the jury's presence was toward the system of justice in Austin. What is significant, however, is not toward whom the bias and prejudice is directed but whether the bias and prejudice is such as would tend to affect the witness' credibility, Ogburn v. State, supra, where the witness testifies to facts hurtful to the defendant, Molloy v. State, 111 Tex.Cr.R. 493, 14 S.W.2d 1032.

It is appellant's theory that since she is white and both the deceased and Warren are black the root of the bias and prejudice is in this racial factor. The theory is, and Warren testified, that he did not believe there was any justice in Austin because no white person could be convicted for killing a black. Appellant contends that showing Warren to have distributed the handbills would have demonstrated this bias and prejudice to the jurors and would have been relevant on the issue of his credibility.

The question before this Court is whether cross-examination of Warren regarding his distribution of the handbills would have been relevant and material on the issue of his credibility in this case. The test of such relevancy is:

". . . Evidence to show bias or interest of a witness in a cause covers a wide range and the field of external circumstances from which probable bias or interest may be inferred is infinite. The rule encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness

may shade his testimony for the purpose of helping to establish one side of the cause only. . . ." Aetna Insurance Company v. Paddock, 301 F.2d 807, 812 (5th Cir. 1962).

■ It is impossible for this Court to ascertain what effect knowledge of the contents of the handbills and that Warren distributed them would have had upon his credibility in the minds of the jurors. It is clear, however, that such excluded evidence tended to show a bias and prejudice toward the system of justice in Austin with reference to this particular case. Despite Warren's testimony that he would not tell anything but the truth, it is a reasonable conclusion from human experience that bias and prejudice could have affected his testimony, especially pertaining to his remembrance (or lack of it) of appellant's explanation of the shooting as accidental. A prior written statement of the witness reflected that the appellant had stated the shooting was an accident. He had to be reminded of this on cross-examination. The excluded evidence is particularly crucial since appellant's main defense was accident. We hold that the trial court should have allowed the appellant to cross-examine Warren regarding the distribution of copies of the handbill, including his reasons for doing so. Also the court should have allowed introduction of the handbill into evidence before the jury for the purpose of showing bias and prejudice which may have affected the credibility of Warren's testimony.

In view of our disposition of this case, the other complaints will not be discussed.

For the above reason, the judgment is reversed and the cause is remanded.

nation on the witness' bias and prejudice was upheld because it required "going over the same matter time and again" and, also,

because the bills of exception were "imperfect and not in such condition as really to be reviewed."