Curtis Paul HARRIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 66879.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 15, 1982.

Rehearing Denied Dec. 15 and
Dec. 22, 1982.

W. Tyler Moore, Jr., on appeal only, Bryan, for appellant.

Travis B. Bryan, III, Bryan, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Before us for automatic review[1] are a conviction for the offense of capital murder[2] and sentence of death assessed pursuant to Article 37.071(e), V.A.C.C.P.

Appellant contends the trial court's refusal to allow effective crossexamination of the State's witness, Valerie Rencher, in order to establish her bias or motive in testifying, denied him his constitutional right to confrontation. See U.S. Const. Amend. VI; and Tex. Const., Article I, § 10. Facts germane to the disposition of this ground of error will be set out below.

The only evidence adduced at trial which connected appellant with the murder of the deceased was the testimony of Valerie Denise Rencher, appellant's sixteen year old girlfriend. According to Rencher, on December 12, 1978, she was with appellant at his home outside Bryan in Brazos County, watching television. At about 7:30 p.m., appellant's brother, Danny, and James Man-

uel arrived in a car[3] and the couple joined them for a ride.

Sometime after Danny Harris had turned onto Sandy Point Road, driven several miles and stopped, he announced that the car would not start. He observed aloud that "twelve miles is too long to walk," so they began walking away from Bryan. A man came out on his porch and Danny asked whether he had any "cables," to which the man replied he did, but his car was not there.

After walking a short distance more, they saw headlights approaching and Danny Harris said, "We're going to stop this car." Standing in the middle of the oncoming vehicle's lane, Danny stopped a pickup truck, driven by Timothy Merka. Merka advised the group he did have some booster cables. After retrieving the cables from his truck, Merka and Danny Harris hooked the cables to each vehicle. Danny attempted unsuccessfully to start the car several times and after working for approximately thirty minutes, Merka suggested that a man down the road might be able to help them; he began preparing to leave, removing the cables from the vehicles.

According to Rencher, Danny Harris and James Manuel went to the trunk of their car and she could hear them talking, but not what they said. Though her testimony was conflicting, Rencher ultimately settled on a version in which she saw Danny at that location, holding a jack. Danny then approached the witness and appellant, who were standing beside the front of the car, and, positioned on the other side of Rencher, whispered across her to appellant: "We're going to drive this man."[4]

1. Article 37.071(f) provides that "[t]he judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals...."

2. Appellant's conviction is under V.T.C.A. Penal Code, § 19.03, which provides in pertinent part:
   "(a) A person commits an offense if he [intentionally or knowingly causes the death of an individual] under Section 19.02(a)(1) of this code and:
   * * * * * *

   (2) the person intentionally commits the murder in the course of committing or attempting to commit ... robbery...."

3. It was later established that the vehicle was a stolen car.

4. Rencher testified that "drive" meant "jump on," but denied she knew the meaning of the statement at the time it was made. On cross-examination it was established that in a prior statement, she had admitted understanding the communication when made.

Rencher could not remember "how" he got it, but she thought appellant got the jack from Danny, then began "drifting" to the driver's side of Merka's truck, then around its rear. Appellant walked behind Merka, and Danny, facing Merka, "pushed [him] with both hands and his chest," knocking him on his back. Danny sat on Merka's stomach, pinning his wrists and appellant "hit [Merka] with the jack." Rencher testified Merka asked, "What do you want?," and she said, "Don't hit him no more," but appellant hit him again. According to Rencher, she at this point got into Merka's truck and seated herself in the middle of the cab.

Rencher testified appellant hit Merka approximately six additional times on the top of his head, then entered the truck; Danny and James Manuel went to Merka's body, apparently located and took the deceased's wallet. Danny Harris observed, "If it was the man's time to die, it was the man's time to die." After more riding around and a side trip to Waller, Rencher went home with appellant and slept with him that night.

On crossexamination, Rencher conceded that as she sat in the truck she could not see what was transpiring outside because the dome light was on and admitted she actually saw appellant hit the deceased twice.[5] She also testified that she did not warn the deceased of the impending attack. She denied remembering her prior statement that Danny Harris struck the first blow and appellant "joined in." She insisted that she could not remember anything about "how" appellant obtained the jack, though she denied he had left his position next to her to get it from the trunk. She acknowledged she had spent two or two and one half hours "rehearsing" her testimony with the District Attorney on the preceding night. She was vigorously crossexamined about never having before mentioned in a statement that she told appellant, "don't hit him no more."

Returning to Rencher's position between appellant and Danny when appellant "all of a sudden had [the jack]," defense counsel inquired:

"Q: For Curtis to get the jack from Danny, he would have either have to handed [sic] it in front of you or behind you, wouldn't he?

A: I guess.

Q: And you don't remember if he did or not?

A: No.

Q: Did anybody promise you anything in exchange for making a statement?

A: No.

Q: No?

A: Not that I can remember.

Q: Did anybody say anything to you like, 'you help us, we'll help you.'

A: I can't remember.

Q: You don't recall saying in a tape recorded statement in response to that question from the District Attorney . . . .

'Nobody has put any pressure on you or promised you anything is that right?'

And you responded,

'I wouldn't say promised me, but there has been somebody that said, "If you help us, we'll help you"?'

Did you say that to the District Attorney on the 8th?

A: Not at this time.

Q: Ma'am?

A: Not at this time.

Q: Was that a true statement that you told the District Attorney . . . that somebody had said to you, 'If you help us, we'll help you?'

A: I can't remember.

Q: You can't remember if that's true or not?

A: What I'm saying is that I can't remember who told me that.

Q: But someone did say that to you?

A: I can't remember.

---

**5.** "Yes, I testified Curtis hit him eight times, but I didn't say I seen him hit him eight times."

Q: *You know, don't you, that you've been accused of the offense of murder, don't you?*[6]

A: Pardon me?

Q: *You know you've been accused of the offense of murder?*

MR. MAYHAN [RENCHER'S ATTORNEY]: Judge, I think I'm going to have to object at this point in time. As far as I know, there is no indictment or complaint or information that's filed against her pending in the District Court that has jurisdiction."

The trial court sustained the witness' attorney's objection.

Defense counsel continued,

"Q: Do you remember when you went before Judge Hensarling ... and she said, *'You've been accused of murder?' Do you remember that?*

[RENCHER'S ATTORNEY]: Judge, again I object. *We're getting into a juvenile matter which is privileged,* I believe, at least at this point in time.

COURT: I have no way of knowing exactly what he's referring to *but if it's a juvenile matter, the objection is sustained.*

\*   \*   \*   \*   \*   \*

Q: Valerie, this gentleman that just stood up in the gray suit, ... *represents you* arising on facts *coming out of this killing, doesn't he?*

[RENCHER'S ATTORNEY]: Judge, I object again, if we're still getting into the juvenile matter.

COURT: Sustained, Mr. Moore.

MR. MOORE: Your Honor, note our exception—

COURT: *Sustained to any juvenile proceedings.*

[RENCHER'S ATTORNEY]: Thank you, Judge.

MR. MOORE: Judge, the jury is entitled to know—"

Whereupon the court intervened and had the jury removed from the courtroom.

Defense counsel stated his intent was to establish the "bias and prejudice of [the witness in this case by showing] the fact certification proceedings have started ... [with the filing of a] petition which charged her with the capital murder for which our client is on trial." Counsel argued that the jury should be fully informed of the witness' status and concluded,

"To deny us the right to effectively cross examine this witness denies us the right to attempt to impeach her as to her credibility by showing what she has to gain or lose as a result of her testimony, denies us the opportunity to show the jury that in exchange for her testimony about what happened in this killing, that if she is convicted she is going to get a favor from the District Attorney's Office."

At this point—and, for the first, as well as last time during this exchange—the District Attorney was heard on the issue: "Judge, I believe that goes to the Burkhalter case,[7] and we've already brought out the ten year situation, and *we object to it, any further questioning about the juvenile proceeding and charges and accusations and so forth.*"

Again, Valerie Rencher's attorney spoke up:

"Well, the only fault I find with the whole thing, Judge, is the fact that we're presuming something that hasn't come to pass. *True enough, there is an application [to certify her as an adult] filed, but the juvenile judge hasn't heard that application,* nor has he ruled, so at this point in time *to say she is accused,* that is that she stands in the shoes of a person accused of a criminal offense *under the*

---

6. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

7. The reference is to *Burkhalter v. State,* 493 S.W.2d 214 (Tex.Cr.App.1973), in which the trial court's refusal to permit disclosure of the State's plan not to prosecute a coindictee if he would testify against Burkhalter without claiming immunity, was held to be reversible error notwithstanding the fact that the record did not clearly establish the witness actually knew of the specific terms of the agreement between his attorney and the State.

*adult laws of the State of Texas is certainly not a true statement of the facts."* Rencher's attorney added that to his knowledge, the Brazos County District Attorney, Travis Bryan, did not represent the State in juvenile matters, but another individual did, "so it's not under their control at this point in time. It's not under this court's control ... because she has not been ... indicated or charged or in any other manner ... come before the jurisdiction of this court on this matter, [but is only] a witness as she sits here now."

Defense counsel requested an opportunity to develop the fact that the juvenile prosecutor had indeed agreed to abate the juvenile proceedings against Rencher at the request of Mr. Bryan, the District Attorney. The court replied, "That will be denied, and both objections of Mr. Bryan and Mr. Mayhan sustained."

At a recess, the defense called Travis Bryan, III. The District Attorney testified that he had communicated with Sarah Ryan, the juvenile prosecutor, and asked that the hearing on the petition pending against Rencher be delayed until the trials against appellant, Danny Harris and James Manuel could be conducted and that Rencher remain in custody until that time. Mr. Bryan stated that his "main concern was the safety of the witness" and denied that he had considered any tactical advantage to be gained by the witness' preindictment status, in the prosecution against appellant.

On appeal, the State argues that "the facts that could have impeached the witness were before the jury and no harm is shown." In support of this contention the State points to the testimony of Rencher's attorney, Richard Mayhan, adduced during the State's case in chief before Valerie Rencher had been called to the stand.

Mayhan testified that he represented Rencher and that such representation "gr[e]w out of the events which occurred on December 11th, 1978 ... which involved the alleged murder of Tim Merka," but the jury was then informed that Rencher was "a juvenile, and she had not been indicted in any felony case." Mayhan stated that Rencher had testified at "a writ of habeas corpus hearing," and had given two prior written statements "regarding this transaction." The prosecutor asked Mayhan if he were "aware of an agreement or a conversation with [the State] regarding [his] client's testimony in this case?" Mayhan's reply:

> "The nature of that agreement is that if my client testified she would receive not more than ten years. This is in no way to say that I think my client is guilty, but this was our agreement. * * * This was, also as I recall, not an agreement on my ... client's behalf to plead guilty or anything of this nature, but it was an agreement that if in the event my client was indicted and if in the event she was convicted or if in the event she pled guilty that she would receive not more than ten years."

Mayhan affirmed he had communicated this agreement to his client.

On crossexamination, defense counsel attempted to fill in what surely must have been blanks in the minds of the jurors by having Mayhan affirm that in Texas, a juvenile must be certified as an adult before he can be indicted and that "a petition to certify [Rencher] as an adult in connection with capital murder of Tim Merka ha[d] been filed." Mayhan reiterated, however, that his client was not then "under any criminal indictment, complaint, or information."[8] The witness admitted that he had refused to allow defense counsel for appellant, Danny Harris and James Manuel to interview his client, citing her extensive crossexamination in the mentioned habeas corpus hearing.

We cannot agree with the State that the facts developed by Richard Mayhan's testimony adequately reflected the facts extant which were probative of the extent of the witness' bias; neither did such testimony

---

8. Outside the jury's presence appellant sought to introduce the Petition for Discretionary Waiver of Juvenile Jurisdiction pending against Rencher, but the trial court refused its admission before the jury.

justify or render harmless the denial of appellant's fundamental right to effective confrontation and crossexamination of the witness against him. We are constrained to reverse.

■ The essential policy underlying the Sixth Amendment right to confrontation is to give the accused an *opportunity* to cross-examine the witnesses against him. *Pointer v. Texas,* 380 U.S. 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). This opportunity to expose falsehood and elicit the truth has been oft characterized as one of the safeguards "essential to a fair trial." 380 U.S. at 404, 85 S.Ct. at 1068.[9]

"Cross-examination is the principal means by which the believability of the witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harrassing interrogation, *the cross-examiner is not only permitted to delve into the witness' story* to test the witness' perceptions and memory, *but* the cross-examiner has traditionally been *allowed to impeach, i.e., discredit, the witness."*

*Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

■ Thus, extreme prejudice ensues from a denial of the opportunity to place a material witness in his proper setting as regards

his testimony. Accordingly, eliciting an admission that the witness has been accused of or incarcerated for a crime may be pertinent to show that his "testimony was biased because given under promise *or* expectation of immunity,[10] *or* under the coercive effect of his detention by officers of [government who are] conducting the present prosecution.[11] * * * Even if the witness were charged with some other offense . . . , [a defendant would be] entitled to show by cross examination that his testimony was affected by *fear or* favor *growing out of his detention."* [12] *Alford v. United States,* 282 U.S. 687, 693, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931).

In *Jackson v. State,* 482 S.W.2d 864, 868 (Tex.Cr.App.1972), it was reiterated,

"Evidence to show bias or interest of a witness in a cause covers a wide range and *the field of external circumstances from which probable bias or interest may be inferred is infinite.* The rule encompasses *all facts and circumstances which,* when tested by human experience, *tend to show that a witness may shade his testimony* for the purpose of helping to establish one side of the cause only . . . ." [13]

■ It is clear that the right to cross-examination for the purpose of affecting a witness' credibility [14] is at least dual: "A

9. "Certain principles have remained relatively immutable in our jurisprudence. One of these is that . . . the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it was untrue. While this is important in the case of documentary evidence, *it is even more important where the evidence consists of testimony of individuals whose memory might be faulty or who, in fact might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination."*
*Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).

10. See, e.g., *Simmons v. State,* 548 S.W.2d 386 (Tex.Cr.App.1977).

11. See, e.g., *Castro v. State,* 562 S.W.2d 252 (Tex.Cr.App.1978).

12. See, e.g., *Randle v. State,* 565 S.W.2d 927 (Tex.Cr.App.1978); and *Evans v. State,* 519 S.W.2d 868 (Tex.Cr.App.1975).

13. Other examples of circumstances which tend to show bias are proof that the witness fears he may be a suspect in the case, e.g., *Davis v. Alaska,* supra; *Castro,* supra; *Evans,* supra; and, any prejudice or condition which might cause the witness selectively to perceive or report events. E.g., *Jackson* (1972), supra.

Circumstances which are *not* probative of a witness' credibility were found in, e.g., *Bilbrey v. State,* 594 S.W.2d 754 (Tex.Cr.App.1980); *Cloud v. State,* 567 S.W.2d 801 (Tex.Cr.App. 1979); *Murphy v. State,* 587 S.W.2d 718 (Tex. Cr.App.1979); and *Warren v. State,* 514 S.W.2d 458 (Tex.Cr.App.1974).

14. Crossexamination for the purpose of establishing facts which are probative of a defensive issue in a criminal case is touched upon *post.*

witness *may be asked* any question, the answer to which may have a tendency to affect his credibility. *And* if he denies anything that would show a motive for, [sic] or animus to, testify against a party, it *may be shown* by other witnesses and by independent facts." 482 S.W.2d at 857. Apparent then, is the fact that when the crossexaminer is improperly denied the *opportunity to ask* a question *and receive* the witnesses' answer for consideration by the factfinder, he may concomitantly be denied the right to establish facts which would illustrate the true circumstances bearing on the issue by extrinsic proof. See *Spain v. State,* 585 S.W.2d 705 (Tex.Cr.App.1979); *Castro v. State,* 562 S.W.2d 252 (Tex.Cr.App.1978); *Randle v. State,* 565 S.W.2d 927 (Tex.Cr. App.1978); *Jackson* (1972), supra; *Curry v. State,* 72 Tex.Cr.App. 463, 162 S.W. 851 (1913). In such a case the accused's right to *effective* confrontation is thoroughly frustrated, and we now hold a frustration of that right is presented in the instant case.

While Valerie Rencher's attorney's testimony indicated to the jury that some type of agreement had been made in exchange for her testimony against appellant, this was not by any means adequate to place the witness, *Rencher,* in her "proper setting" and put the weight of *her* testimony and *her* credibility to the test without which the jury could not fairly appraise *her.* See *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Alford,* supra; and *Spain,* supra. Richard Mayhan's credibility was not in issue;[15] the jury had a right to observe *Valerie Rencher* under questioning in this regard. If Valerie Rencher had denied—as Mayhan repeatedly did—that she was "charged with" or "accused of" the offense with which appellant was on trial, there is no doubt the defense would have been entitled to establish certain allegations made in the pending Petition for Discretionary Waiver of Juvenile Jurisdiction, which at least clarified, and at most, rebutted that testimony.[16] But, the record reflects the trial court refused the admission of that petition before the jury when offered upon *Mayhan's* denial,[17] and, it is clear, improperly so. While the State and the trial court apparently believed Mayhan's carefully qualified denial—that his

---

15. In fact Mr. Mayhan's role in this entire matter is puzzling. It is clear that neither he nor his client was a party to this lawsuit, with standing to make objections. *Draper v. State,* 596 S.W.2d 855, 857, n. 2 (Tex.Cr.App.1980). But it was he who made and argued all objections to the defendant's questions regarding his client's status in the juvenile court. In this capacity, Mayhan could only be acting on behalf of the State.

While the suggestion that a defendant may be denied cross-examination of a material State's witness so long as he may cross-examine an assistant district attorney in the case may sound ludicrous, that is essentially what was done here. We are at a loss to understand the trial court's receptivity to such a state of affairs. One particularly awkward moment when Mayhan was under voir dire examination was eased thus:

"THE WITNESS: Judge, excuse me, if I might speak from the posture of a witness, but I also represent Ms. Rencher and I need to—

THE COURT: You can wear two hats, counsel. Take the witness hat off and put the lawyer's hat on."

See and cf. State Bar of Texas, Rules and Code of Professional Responsibility, EC 5–9 (1972).

16. Among other things, that petition alleged that the State of Texas "would respectfully

show the Court that she has information and reason to believe, and does believe that:

\* \* \* \* \* \*

III.

On or about the 11th day of December, 1978, [Valerie Denise Rencher] violated a penal law of this State punishable by imprisonment. . .to wit: Article 19.02 of the penal code of Texas, in that *she did then and there* in Brazos County, Texas:

. . . *intentionally and knowingly cause the death of an individual, Timothy Michael Merka,* by striking him on the head with a hard metal object; *and the said Valerie Denise Rencher did then and there intentionally cause the death . . . in the course of committing the offense of robbery* of the said Timothy Michael Merka.

\* \* \* \* \* \*

V.

The offense alleged is against the person and was done in a premeditated and agressive manner.

*There is evidence upon which the Grand Jury may be expected to return an indictment.* \* \* \* "

17. The petition was introduced as defense Exhibit No. 23 for the record.

client was "accused, that is that she stands in the shoes of a person accused of a criminal offense under adult laws of the State of Texas"—would somehow prevent a full explanation of just exactly how his client *did* stand accused, it in fact exacted full disclosure. *Bell v. State,* 620 S.W.2d 116 (Tex.Cr. App.1981) (Opinion on State's Motion for Rehearing); see also Article 38.24, V.A.C. C.P.

Once this petition was before the jury, appellant would have been entitled to develop through crossexamination of Rencher, the fact that she had been confined in State custody pursuant to it since several days after the commission of the offense and thereby establish a basis for an inference that her testimony was "affected by fear or favor growing out of her detention." 282 U.S. at 693, 51 S.Ct. at 220; see also *Castro,* supra. The jury was also entitled to know that the district attorney had intervened in the juvenile cause so as to delay its adjudication until after Rencher's testimony could be had against appellant.[18]

The State does not address the merits of the issue on appeal, but at trial the district attorney argued the petition had no relevance, and constituted a "record of a juvenile proceeding and is not an open record, not admissible in this court." Defense counsel responded that whatever goals were advanced by the confidentiality of juvenile records were subordinate to his right to impeach the witness and establish as a matter of law that she was an accomplice within the meaning of Article 38.14, V.A.C. C.P.[19]

In *Davis v. Alaska,* supra, the Supreme Court confronted a virtually identical set of material circumstances. Conceding the State's interest in confidentiality of juvenile matters, the Court observed the purpose of the evidence offered by the defense was to suggest the witness was biased and, therefore, his testimony was either not to be believed or, at the very least, to be considered in light of that bias; that serious damage to the State's case was a "real possibility" had the defendant been allowed to pursue the line of inquiry terminated.

The Supreme Court there concluded,

"In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender. Whatever temporary embarrassment might result to [the witness] or his family by disclosure of his juvenile record—*if the prosecution insisted on using him to make its case*—is outweighed by [an accused's] right to probe into the influence of possible bias in the testimony of a crucial identification witness.

\*     \*     \*     \*     \*     \*

In *Alford v. United States...,* the Court stated:

'[N]o obligation is imposed on the court, such as that suggested below, to protect a witness from being discredited on cross-examination short of an attempted invasion of his constitutional protection from self-incrimination, properly invoked. There is a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harrass, annoy or humiliate him.' [*Id.,* 282 U.S. at 694, 51 S.Ct. at 220.]

\*     \*     \*     \*     \*     \*

Rencher's status as an accomplice was the only substantive issue—save her credibility—in the case, and the court charged the jury as to her being an accomplice witness as a matter of fact.

---

18. It is irrelevant that the district attorney's asserted reason for his intervention was to insure the witness' safety. Regardless of his internal mental processes, one real effect of his intervention was assurance that the matter loomed large before the witness when she testified against appellant. A *possible* effect of it was the avoidance of a change in Rencher's status from "juvenile accused" to "coindictee" which would have decisively made her an accomplice witness as a matter of law in appellant's prosecution.

19. Article 38.14, V.A.C.C.P. provides:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

The State could have protected [the witness] from exposure of his juvenile adjudication in these circumstances by refraining from using him to make out its case; *the State cannot, consistent with the right of confrontation, require [an accused] to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records.*"

415 U.S. at 319–320, 94 S.Ct. at 1111. See also *Texas Board of Pardons and Paroles v. Miller,* 590 S.W.2d 142 (Tex.Cr.App.1979); and *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

■ In the instant case, appellant had an unqualified right to ask, as he did, the only witness linking him with the offense, whether she too had been "accused" of the offense on trial, and to receive her answer; the jury was entitled to understand the "whole picture" of the witness' vulnerable status in the juvenile court and observe *her* testimony thereon. That she had not yet been adjudicated a delinquent child or ordered transferred to the district court under the pending cause was itself a relevant circumstance, probative not only of her credibility as a witness, but also of the only substantive issue in the case: whether she was an accomplice witness whose testimony would require corroboration.[20]

■ Finally, we find the suggestion that the testimony of a material State's witness' *attorney*—a highly interested person whose sole duty is to employ studied and professional skills in tactics, semantics and logic to the end of shielding his client from at-

tacks, real, imagined or potential—may be substituted for an accused's right to confront and crossexamine the only witness against him, nothing short of macabre. The reasons for rejecting such a notion are self evident.

■ Neither are we impressed with the State's contention that the defense's failure to elicit Valerie Rencher's responses to the questions disallowed, on a bill of exception, waived the error under Article 40.09, subd. 6, V.A.C.C.P.[21] As was observed in *Mutscher v. State,* 514 S.W.2d 905 (Tex.Cr.App. 1974), an appellant is not restricted to any one method in showing any fact which would tend to establish ill feeling, bias, motive and animus on the part of a witness against him.[22] Here, the record is fully developed as to the facts the defense sought to establish and the reasons such facts were probative of Rencher's credibility. Compare *McManus v. State,* 591 S.W.2d 505 (Tex.Cr.App.1979); *Cloud v. State,* 567 S.W.2d 801 (Tex.Cr.App.1979); *Moreno v. State,* 587 S.W.2d 405 (Tex.Cr.App.1979); *Mutscher,* supra; and *Luna v. Beto,* 395 F.2d 35 (CA5 1968).

And finally, lest it be forgotten that the error committed in the first instance was the denial of an *opportunity to propound questions* in the presence of the jury, we quote from *Spain,* supra, at 710:

"Just as *Alford* held that a defendant is not required to show what facts the cross-examination would have revealed in order to establish prejudice, the appellant

*the transcription* of the court reporter's notes ... *shows* the occurrence or existence of any particular *action by the court* or refusal of the court to act or any objection or exception or any other event, *no further proof of the occurrence or existence of same shall be necessary.*"

See also (c) and (d)(1)–(2).

20. We need not further explicate our rejection of the State's purported distinction between *Davis v. Alaska,* supra, where the witness had been adjudicated a delinquent and placed on juvenile probation, and the instant case.

21. Article 40.09, subd. 6, V.A.C.C.P. provides in relevant part:
"(a) A party desiring to have the record disclose some *action,* testimony, evidence, proceeding, objection, *exception* or other event or occurrence *not otherwise shown by the record* may utilize a bill of exception for this purpose. * * *
(b) A bill of exception shall be a necessary predicate for appellate review *only if the matter complained of is not otherwise shown by the record* as herein provided. * * * If

22. However, in *Mutscher,* supra, the failure to develop what the witness' testimony would have been on crossexamination was fatal to the ground on appeal because the record did not indicate in what manner a pending Federal indictment might possibly affect the witness' testimony in Mutscher's State prosecution.

in the present case is not required to show that his cross-examination would have affirmatively established the facts sought.

An effective cross-examination encompasses more than just the opportunity to elicit testimony to establish the existence of certain facts. *The cross-examiner should be allowed to expose the limits of the witness' knowledge of relevant facts, place the witness in his proper setting, and test the credibility of the witness.* The failure to affirmatively establish the fact sought does not prevent the cross-examination from having probative value in regard to the witness' credibility. *An unbelievable denial of the existence of a fact can be even more probative as to lack of credibility than an affirmative admission of the fact."*

Though the law is clear that a showing of want of prejudice cannot cure a denial of the right of effective crossexamination,[23] we hasten to add in conclusion that, like that of the witness in *Davis v. Alaska,* supra, the testimony of Valerie Rencher adduced on crossexamination indicates she was, in effect, asserting a right to give questionably truthful answers in anticipation of the trial court's protection.[24] See also *Spain,* supra. Indeed, the objections interposed by her attorney which were sustained by the court could not have been made at a more critical time in terms of the cogency of her story and the credibility of her testimony. "It would be difficult to conceive of a situation more clearly illustrating the need for cross-examination." 415 U.S. at 314, 94 S.Ct. at 1109.

For the refusal of the trial court to allow appellant "to place the parties and the witness in their proper prospective [sic] and to develop further the interests involved,"[25]

the judgment of conviction is reversed, and this cause is remanded to the trial court.

McCORMICK, Judge, dissenting.

The Court, in reversing this conviction, is not only misconstruing *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 247 (1974), but is also misinterpreting the record in this case.

The majority reverses the conviction because the appellant was not effectively allowed to cross-examine the State's witness, Valerie Rencher, in order to establish her bias or motive in testifying. However, in examining the record, I found that the evidence of her possible bias or motive in testifying *did* come before the jury. It is a logical tactic to try and diminish to the greatest extent possible any harmful effect that a witness can have on the presentation of one's case. That is the reason that often when a defendant testifies in his own behalf his attorney will open the direct examination by going into the defendant's past record. This informs the jury that there may be a reason to question the credibility of a witness' testimony and takes away the "shock effect" that would occur if this evidence was allowed to be first brought out on cross-examination by opposing counsel.

This is exactly what the State did in the instant case. Wanting to be open and above-board with the jury, before even calling Valerie Rencher to the stand, the State called her attorney, Richard Mayhan. Mayhan's testimony informed the jury that he had negotiated an agreement for his client whereby if she testified in this case she would not receive more than ten years. On cross-examination he testified that a petition to certify Rencher as an adult in connection with the instant offense had been

---

**23.** Such a denial is "constitutional error of the first magnitude and no amount of showing of want of prejudice [will] cure it." *Davis v. Alaska,* supra, at 318, 94 S.Ct. at 1111; see also *Spain,* supra; *Evans,* supra.

**24.** While it is apparent that the State's tactic was to have Mayhan testify to the specific terms of the agreement between the parties first and later have Rencher disclaim remembering those terms, thereby satisfying *Burkhal-*

ter, supra, Mayhan had already told the jury he had communicated the agreement to his client. Therefore, Rencher's memory lapse alone justified an exploration on crossexamination of *her* understanding of *her* status vis-a-vis the offense on trial.

**25.** *Smith v. State,* 541 S.W.2d 831, 835 (Tex.Cr. App.1976).

filed. Surely the jury, after hearing this testimony, realized the potential for bias in Rencher's forthcoming testimony. To say otherwise would be to render a disservice to the jury's intelligence.

Certainly, Rencher's attorney, who had negotiated with the prosecution and who was trained in the law, could, better than Rencher, testify as to any agreement and the effect her testimony would have on such agreement.

Furthermore, appellant has failed to demonstrate any harm suffered as a result of being denied the opportunity to cross-examine Rencher in regard to this matter. My search of the record reveals that appellant did not preserve a bill of exception as to the evidence he would have brought out on cross-examination. As this Court has held in a multitude of cases, failure to preserve a bill of exceptions is failure to preserve error. *Passmore v. State,* 617 S.W.2d 682 (Tex.Cr.App.1982); *Marini v. State,* 593 S.W.2d 709 (Tex.Cr.App.1980).

The majority relies on *Davis v. Alaska,* supra. However, *Davis* may be distinguished from the case at bar. In *Davis,* the evidence of the witness' possible bias and prejudice *never* got to the jury. In the instant case, before the defense could attempt to bring out the possibility of bias, the State introduced the possibility of bias through their own witness.

I agree with the Supreme Court in *Davis* and in *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed.2d 624 (1931), that defense counsel has a right to impeach a witness by showing a possibility of bias. But when that evidence is already before the jury, no harm is suffered by limiting the defense's cross-examination of that witness.

I would refer the majority to Justice Stewart's concurring opinion in *Davis* where he says:

"In joining the Court's opinion, I would emphasize that the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delin-

quency adjudications or criminal convictions." 415 U.S. at 321, 94 S.Ct. at 1112.
I would suggest that this is one of those cases.

Finally, I would refer the majority to the dissenting opinion in *Davis.* There is no constitutional principle at stake here as the majority argues. As Justice White writes:

"This is nothing more than a typical instance of a trial court exercising its discretion to control or limit cross-examination...." 415 U.S. at 321, 94 S.Ct. at 1113.

The record shows that defense counsel *was* afforded opportunity to conduct *extensive* cross-examination of Rencher. This Court has long recognized that the manner and extent of cross-examination rests in the discretion of the trial judge and rarely will the trial judge's discretion be disturbed on appeal. Ray, The Law of Evidence (1980). The majority in *Davis v. Alaska,* supra, recognized this when they wrote:

"Cross-examination is the principle means by which the believability of a witness and the truth of his testimony are tested. *Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation,* the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach; i.e., discredit, the witness." (Emphasis added) 415 U.S. at 316, 94 S.Ct. at 1110.

Where, as in the instant case, the impeaching material has already been laid before the jury, the trial judge's discretion should be upheld.

For the above reasons, I vigorously dissent to the reversal of this conviction.